Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
100 Pine St. Ste. 1250
San Francisco, CA 94111
Telephone: 415-745-3232
Email: pblack@wolfpopper.com

Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
570 Lexington Ave.
New York, NY 10022
Telephone: (212) 759-4600
Email: scoffin@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAD JOSEPH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OURA INC., OURA HEALTH OY d/b/a OURARING INC., and subsidiaries, Defendants,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Jad Joseph ("Plaintiff" or "Joseph"), individually and on behalf of all others similarly situated, brings this action against Oura Inc. and Oura Health OY d/b/a Ouraring Inc., (collectively "Oura," "the Company," or "Defendants"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1. Plaintiff brings this class action on behalf of a nationwide class comprised of all persons in the United States who purchased the Oura Ring 5, Oura Ring 4, and Oura Ring 4 Ceramic (the "Rings," the "Oura Rings," or the "Products"), which Defendants represented to consumers had the ability to accurately track the quality and stages of users' sleep, when they in fact did not.

2. Oura is a company that develops, markets, and sells Rings, which cost at least $300, to consumers that it advertises can track the four stages of users' sleep with the accuracy of a clinical sleep lab.

3. Oura broadly markets the Products to consumers throughout the United States through its websites, social media platforms, retail partners, influencer campaigns, celebrity endorsements, and targeted digital advertising. Across these channels, Oura consistently represents that the Rings accurately track users' sleep stages, provide detailed analyses of REM sleep, deep sleep, and light sleep, and can generate reliable sleep stage data that consumers can use to make decisions about their health and well-being.

4. In reality, Oura's Rings do not have the sensors required to observe the neurological activity that defines sleep stages. The Rings do not have the specific EEG, EOG, and EMG sensors that measure brain waves, eye movements, and muscle activity, which are needed to perform the widely accepted method of sleep stage tracking, clinical polysomnography.

5. Because they do not have these sensors, the Rings can only collect indirect certain physiological signals like heart rate, movement, and blood oxygen temperature, which merely generate algorithmic estimates based on those indirect signals, which have been found by peer-reviewed studies to be severely inaccurate.

6. Consumers purchase the Rings, and do so at a substantial premium, specifically because of Defendants' representations concerning sleep stage tracking accuracy. Consumers lack specialized expertise in sleep medicine and have no ability to independently determine whether a wearable ring can accurately sleep stages. Consequently, consumers rely on Defendants' representations, scientific claims, and promises of accuracy when deciding whether to purchase the Products and how much to pay for them. Had consumers known the truth, they would not have purchased the Products or would have paid substantially less for them.

7. Plaintiff was one of such consumers who purchased an Oura Ring as a gift to a family member after he reasonably relied upon Defendants' representations that the Ring could accurately track sleep stages. Like many other consumers, Plaintiff did not know that the Products lacked the capability to directly determine sleep stages and would not have purchased the Rings, or would not have paid the price premium charged by Defendants, had the true facts been disclosed.

8. Defendants' conduct as alleged herein violates the California Consumers Legal Remedies Act Cal. Civ. Code §§ 1750 ("CLRA"), California Unfair Competition Law ("UCL"), California Civil Code § 17200, and New York General Business Law § 349 ("GBL"), and amounts to unjust enrichment.

**PARTIES**

9. Plaintiff Jad Joseph is an individual and a resident of New York.

10. Defendant Oura Inc. is a Delaware corporation with a principal place of business located at 415 Kearny St., San Francisco, CA 94108.

11. Defendant Oura Health Oy is a Finnish corporation that does business in the United States as Ouraring Inc., which is a corporation with a principal place of business at 415 Kearny St, San Francisco, CA 94108.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal

diversity exists. Plaintiff is a citizen of New York and Defendants are citizens of California (where Defendants have their principal office and under whose laws Defendant is organized).

13. This Court has personal jurisdiction over Defendants because their principal business office is in California.

14. Venue properly lies in this district pursuant to 28 U.S.C. §1391 because Defendants reside within this district within the meaning of 28 U.S.C. §1391.

15. Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco Division of this district is proper because Defendants' principal office is in San Francisco County, California.

## FACTUAL ALLEGATIONS

### A. Consumer Demand for Accurate Wearable Sleep Trackers

16. Consumers are desperate for products that can accurately track sleep stages, because so many suffer from sleep difficulties. Indeed, a 2024 Study released by the National Center for Health Statistics, an affiliate of the Center for Disease Control, found that 30.5% of adults had short sleep duration, 15.4% had trouble falling asleep, and 18.1% had trouble staying asleep, while just 54.8% were considered well-rested.[1]

17. Because so many suffer from poor quality sleep, there is acute consumer demand for wearable products that can accurately track sleep stages. A study conducted the American Academy of Sleep Medicine found that more than one in three Americans had that used a wearable sleep tracker.[2]

18. The same study found that consumers rely on the assessments of sleep stages provided by these wearable sleep trackers to make medical decisions. Of the 35% of Americans who had tried these wearable sleep trackers, 68% reported changing their behavior in response to

---

[1] *Short Sleep Duration and Sleep Difficulties Among Adults: United States, 2024*, NCHS (April 29, 2026) https://www.cdc.gov/nchs/products/databriefs/db559.htm (https://perma.cc/J5Y6-FBT7).

[2] *One in three Americans have used electronic sleep trackers, leading to changed behavior for many*, American Academy of Sleep Medicine (Nov. 15, 2023) https://aasm.org/one-in-three-americans-have-used-electronic-sleep-trackers-leading-to-changed-behavior-for-many/ (https://perma.cc/E966-V53A).

the information provided by the product. In connection with the release of this study, Dr. Seema Khosla, a spokesperson for the American Association of Sleep Medicine, stated: "It is important to use the information in the context of how you feel. If your sleep is not restorative and your sleep tracker shows low oxygen levels at night, it is best to have this evaluated further by your primary care or sleep clinician."[3]

19. The increase in consumer use of and reliance on wearable sleep trackers has created a lucrative and fast-growing industry. In 2025, the total market for sleep trackers was valued at $6.75 billion, and analysts expect the industry will grow to $25 billion by 2034.[4]

20. One of the primary obstacles to mass adoption of wearable sleep trackers is the fact that many consumers, who already are more likely to have a hard time falling asleep, express that wearing these products at night is physically uncomfortable. Indeed, a 2025 study titled "Perspectives Regarding Consumer Sleep Technology and Barriers to its Use or Adoption Among Adults in the United States" conducted by an interdisciplinary team of researchers found that physical comfort "emerged as a common barrier in qualitative analysis[,]" with one participant in the study stating that the tested product was "Difficult to wear and sleep comfortably."[5]

21. The study also identified consumer skepticism regarding data accuracy as another major impediment to use of wearable sleep trackers, with participants stating: "I don't know how

---

[3] *Id.*

[4] *Sleep Trackers Market Size, Share & Industry Analysis, By Technology (Actigraphy Based, Polysomnography-Integrated, HRV-Focused, Oximetry-Based ($SpO_2$) Devices, and Others), By Device (Watches, Bands, Rings, and Others), By Application (Personal Wellness & Lifestyle Improvement, Clinical & Health Monitoring, Sports & Performance Optimization, and Others), By End User (Business to Business and Business to Consumer), and Regional Forecast, 2026-2034*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/sleep-trackers-market-113884 (Aug. 17, 2026).

[5] *Perspectives Regarding Consumer Sleep Technology and Barriers to its Use or Adoption Among Adults in the United States*, Mary Kress, BS, Nicholas R. Lenze, MD MPH, Ruby J Kazemi, MD, Allison K. Ikeda, MD, MS, Punithavathy Vijayakumar, MBBS MS, Cathy A. Goldstein, MD, Jeffrey J. Stanley, MD, Michael J. Brenner, MD, Paul T. Hoff, MD, https://pmc.ncbi.nlm.nih.gov/articles/PMC11879103/pdf/nihms-2058286.pdf (April 2025) (https://perma.cc/X7J6-Y48T).

reliable the information is if it's not coming from medical grade equipment[,]" and "I would need proof that [Consumer Sleep Technology] is accurate data."[6]

22. The most widely sold wearable sleep trackers are the Apple Watch, the Samsung Galaxy Watch, and the Google Fitbit, which are all wrist-based products that use proxy measurements such as heart rate and blood oxygen to approximate the quality of sleep. These proxies cannot measure sleep stages at clinical accuracy, which can only be done by measuring brain activity, but can be assessed through products worn on the wrist which are widely accepted to be more comfortable than products worn on the forehead, ear or neck as would be required to accurately determine sleep stages.[7]

23. Other wearable sleep trackers, such as the Dreem 3 Headband, the Sleep Profiler Headband, or the Zmachine Insight + neck-based system, can sleep stages by placing electrodes on the placed on the forehead, ear, or neck, which pose more discomfort to users.[8] These products deploy the "gold standard" method of clinical sleep monitoring, which has been widely understood to be Polysomnography (PSG), and measures neurological activity including electroencephalogram (EEG), electrooculogram (EOG), and electromyogram (EMG) activity, as well as physiological proxies.[9]

24. Consumers are uniquely reliant on accuracy when seeking sleep-related information. Unlike calorie counts, step totals, or exercise estimates, sleep stage information is not something consumers can independently verify. A user cannot determine, by observation alone, whether they spent a particular amount of time in each stage of sleep. As a result, consumers must rely almost entirely on the representations of the device manufacturer regarding the accuracy of those measurements.

**B. Oura's Development, Marketing, and Sale of the Rings**

---

[6] *Id.*
[7] *EEG-based headset sleep wearable devices*, npj biosensing, NATURE http://nature.com/articles/s44328-024-00013-y (Oct. 1, 2024) (https://perma.cc/T2EU-4VU8).
[8] *Id.*
[9] *Id.*

25. Defendants repeatedly promoted the Oura Ring as an unusually accurate wearable sleep tracker. Rather than marketing the Product merely as a wellness accessory or lifestyle tool, Defendants consistently represented that the Oura Ring could accurately identify and quantify a user's sleep stages and provide dependable information concerning the user's overnight sleep patterns.

26. Oura has deployed a wide-reaching advertising campaign that at all times has represented to consumers that the Rings can accurately track users' sleep stages. For instance, Oura's website contains a host of misleading representations that convey to consumers that the Rings can track users' sleep cycle. These representations include:

i. "95% Sleep Staging Accuracy Compared to clinical sleep lab."[10]

ii. "Wake up to in-depth analysis of your deep sleep, REM sleep, and light sleep."[11]

iii. "50+ PhDs working across an in-house team of clinicians and scientists."[12]

iv. "79% agreement with gold-standard polysomnography (PSG) for classifying the four stages of sleep."[13]

v. "Unparalleled Accuracy."[14]

vi. "Smart Sensing technology adapts to your finger to deliver highly accurate, continuous data."[15]

---

[10] *Oura Ring 5*, OURA, https://ouraring.com/store/rings/oura-ring-5 (https://perma.cc/3CWS-W67P).

[11] *Id.*

[12] *WHY OURA, A First-of-Its-Kind Smart Ring*, OURA, https://ouraring.com/why-oura (https://perma.cc/MYD2-XAHE).

[13] *Oura's New Sleep Staging Algorithm: More Accurate Than Ever Before*, OURA (Nov. 16, 2022), https://ouraring.com/blog/new-sleep-staging-algorithm/ (https://perma.cc/A49X-MFG7).

[14] *Oura Ring 4*, OURA, https://ouraring.com/blog/smart-sensing/ (https://perma.cc/X6ED-2V58).

[15] *Oura Ring 4 Ceramic*, OURA, https://ouraring.com/store/rings/oura-ring-4-ceramic (https://perma.cc/S3CU-Q28U).

vii. "Your score is based on how long you spent in each sleep stage and key signals like how long it took you to fall asleep and the timing of your sleep."[16]

viii. "Sleek, comfortable and accurate."[17]

ix. "Oura Ring: An Alternative to PSG Sleep Studies."[18]

27. Oura also makes representations through major retailers such as Amazon that similarly convey that the Rings can accurately track sleep cycles. For instance, Oura's representations on the Amazon order page for the Oura Ring 5, which are substantially similar to all Amazon order pages for its Products, include:

i. "Oura Ring 5 delivers 50+ health metrics with research-grade accuracy."[19]

ii. "Developed with medical professionals…Our features are created in tandem with trusted advisors across medical fields."[20]

iii. "With over 12 years of research and innovation, the award-winning Oura Ring is trusted by academic institutions, athletes, physicians and over 5 million members across the globe."[21]

iv. "Accurate by design…Research-grade sensors powered by Smart Sensing adapt to your finger, where the pulse signal is up to 100x stronger than the wrist, delivering optimal accuracy."[22]

28. Oura proliferated these representations regarding the accuracy of the Rings to consumers and the public on its social media pages and through a widespread network of influencers. For instance, Oura posts nearly every day on its Facebook page (@OURA) to

---

[16] *Id.*
[17] *Id.*
[18] Oura Team, *What Is a Polysomnography (PSG) Sleep Study?*, OURA (Dec. 6, 2022), https://ouraring.com/blog/what-is-a-polysomnography-psg-sleep-study-and-how-is-oura-different/ (https://perma.cc/QDL6-5FL4).
[19] *Oura Amazon Order Page* (https://perma.cc/NAX5-7Q9B)
[20] *Id.*
[21] *Id.*
[22] *Id.*

approximately 135,000 followers, which often include similar representations regarding the accuracy of the Rings to those identified above.[23]

29. Similarly, Oura posts on a regular basis on its X account (@ouraring) to approximately 56,000 followers, which often include similar representations regarding the accuracy of the Rings to those identified above.[24]

30. Defendants' YouTube channel (@oura_ring) has over 24,200 subscribers and has posted a number of promotional videos for the Rings, which often include similar representations regarding the accuracy of the Rings to those identified above.[25]

31. Defendants' Instagram account (@ouraring) has approximately 1.1 million followers, which often include similar representations regarding the accuracy of the Rings to those identified above.[26]

32. Defendants' TikTok account (@ouraring) has approximately 148,900 followers and has generated nearly 1 million cumulative "likes" for their array of promotional videos, some of which include similar representations regarding the accuracy of the Rings to those identified above.[27]

33. Oura also cultivated influencer and celebrity endorsements to broadcast and legitimize its representations regarding the accuracy of the Rings to consumers and the public, because consumers are more likely to trust product claims when presented by individuals whom they follow and admire. A wide range of celebrities, including Kim Kardashian, Jennifer Aniston, and Prince Harry, have promoted the Rings in the popular press and on social media.[28]

---

[23] OURA, FACEBOOK (Jan. 15, 2026), https://www.facebook.com/photo/?fbid=818969114866129&set=a.818969028199471 (https://perma.cc/UJ9X-2L5W).

[24] OURA, X, https://x.com/ouraring (last accessed Sept. 3, 2026).

[25] OURA, YouTube, (Oct. 3, 2024) https://www.youtube.com/watch?v=HCRo2HYYIUA, (https://perma.cc/6CQS-DZK3).

[26] OURA, Instagram, https://www.instagram.com/ouraring/?hl=en (last accessed Sept. 3, 2026).

[27] Oura, TikTok, https://www.tiktok.com/@ouraring?lang=en (https://perma.cc/ZXB8-SXER).

[28] Rebekah Clark, I Stay Awake at Night Thinking About the Great Sleep Kim Kardashian Is Getting, GRAZIA, https://graziamagazine.com/articles/kim-kardashian-sleep-oura/; Jennifer Maas, Jennifer Aniston Reveals What Jimmy Kimmel Got Her 'Addicted' to That's Ruining Her Life (Video), THE WRAP (Sep. 14, 2021), https://www.thewrap.com/jennifer-aniston-jimmy-kimmel-oura-ring-toss-salad-morning-show-video/; Cheryl Wischhover, Everything You Need to Know

34. Certain celebrity endorsers commented on the Rings' capacity to track sleep, and promoted the use of the Rings to collect data that can be used to develop sleep habits. For instance, NBA Star Jalen Brunson stated in a promotional video released by Oura that "Oura has definitely helped me develop habits when it comes to my recovery. To be able to see the data about how I'm recovering, how I'm sleeping, and how ready I am at the click of a button just makes it easier to be more in tune with everything."[29]

35. Defendants utilized sophisticated targeted algorithmic advertising tools targeted advertising strategies designed to identify, track, segment, and repeatedly solicit consumers who had expressed interest in sleep health, wearable technology, fitness tracking, longevity, recovery, and related health-monitoring products.

36. Most consumers are not trained sleep researchers, neuroscientists, or medical professionals, and cannot be expected to independently investigate the technical validity of health-tracking claims before purchasing a wearable device. Consumers shopping online or in retail settings are entitled to rely on advertising representations instead of conducting their own review of scientific literature. When confronted with Defendants' extensive marketing campaign, reasonable purchasers may accept the advertised claims regarding sleep tracking without questioning the underlying methodology.

37. Because of Defendants' advertising and promotional efforts, consumers, including Plaintiff, paid prices reflecting the belief that the Products could accurately identify sleep stages. Purchasers therefore paid a premium tied to capabilities that the Rings could accurately track sleep stages.

**C. Oura Rings Cannot Accurately Track Users' Sleep Stages**

---

About Prince Harry's Sleep Tracker Fitness Ring, VOX (Oct. 19, 2018), https://www.vox.com/the-goods/2018/10/19/17999542/prince-harry-oura-ring-sleep-tracker-australia. (last visited September 3, 2026).

[29] *All Hours With Oura: Jalen Brunson*, OURA, https://ouraring.com/blog/all-hours-with-oura-jalen-brunson/?srsltid=AfmBOoqevzYuK13IZo_AI7SEX7_S1xAHW9V2pkG29aOolDvd1Skzs_ke (https://perma.cc/4Y3Y-J9XE).

38. In truth, the Oura Rings cannot track sleep stages at all, because they are defined by neurological activity occurring within the brain. Modern sleep medicine relies upon polysomnography ("PSG") as the accepted clinical standard for determining sleep stages. PSG uses electroencephalography ("EEG"), electrooculography ("EOG"), electromyography ("EMG"), and other physiological measurements to directly observe the neurological and physiological signals that define the sleep stages of wakefulness, light sleep, deep sleep, and REM sleep.[30]

39. Independent peer-reviewed scientific research confirms that the Rings are incapable of performing the sleep-stage tracking promised by Defendants. Indeed, in contrast to Defendants' claims that the Rings have 79% sleep stage tracking accuracy, a peer-reviewed study published in 2017 in the scientific journal Behavioral Sleep Medicine (the "Behavioral Sleep Medicine Study") found that the rings were 65% accurate at measuring "light sleep," 51% accurate at measuring "deep sleep," 61% accurate at measuring REM sleep, and just 48% accurate at measuring wake.[31]

40. Another peer-reviewed study released in 2023 in the journal JMIR mHealth and uHealth (the "JMIR Study") measured the accuracy of various sleep tracking devices, including the Oura Ring 3 and four other wearable sleep trackers. The JMIR Study found that the Oura Ring 3 had an overall accuracy of just 54.27% at the "classification of 4 sleep stages."[32]

41. In another peer-reviewed study released 2025 in Nature (the "Nature Study") found the Rings to only be approximately 50% accurate at inferring sleep stages.[33]

42. The Nature Study compared a sample of results for 45 nights from 45 different patients as reported the Rings and using the "gold standard" PSG method. Based on this sample

[30] *Supra* Note 7.

[31] Massimiliano de Zambotti et al., *The Sleep of the Ring: Comparison of the ŌURA Sleep Tracker Against Polysomnography*, BEHAV SLEEP MED. (Mar. 21, 2017) https://pmc.ncbi.nlm.nih.gov/articles/PMC6095823/.

[32] Taeyoung Lee et al., *Accuracy of 11 Wearable, Nearable, and Airable Consumer Sleep Trackers: Prospective Multicenter Validation Study*, JMIR MhealthUhealth (Nov. 2, 2023) https://pmc.ncbi.nlm.nih.gov/articles/PMC10654909/.

[33] Sebastian Herberger et al., *Performance of Wearable Finger Ring Trackers for Diagnostic Sleep Measurement in the Clinical Context,* NATURE (Mar. 19, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11923143/pdf/41598_2025_Article_93774.pdf.

comparison, the Oura Rings underreported light sleep by 13.84 minutes and deep sleep by 5.98 minutes, while overreporting REM sleep by 31.56 minutes relative to PSG.[34]

43. In another peer-reviewed study (the "University of Massachusetts Study"), researchers at the University of Massachusetts determined that the Rings are unable to provide accurate sleep stage data.[35] The University of Massachusetts Study also found substantial discrepancies from PSG among patients of all age brackets, with even lower accuracy for older adults.

44. Under established sleep-scoring criteria, REM sleep is identified primarily through rapid eye movements and associated neurological activity, while deep sleep is identified through characteristic slow-wave brain activity detectable only through EEG measurements.[36]

45. Oura Rings do not contain any of the sensors that are required to directly measure the neurological signals that are used to detect sleep stages.[37]

46. Oura Rings do not contain EEG sensors capable of measuring brain activity.[38]

47. Oura Rings do not contain EOG sensors capable of measuring eye movements.[39]

48. Oura Rings do not contain EMG sensors capable of measuring muscle tone.[40]

49. Oura Rings do not employ the electrodes and monitoring equipment necessary to perform a polysomnography study. Instead, the Products are worn on a user's finger and collect "peripheral physiological signals," which include heart rate and heart rate variability, physical movement, temperature of skin, and blood-oxygen level and trends. As a matter of design, the Products cannot directly observe any of the neurological activity that defines sleep stages.[41]

---

[34] *Id.*
[35] Mary Emma Searles, et. al., *Performance Evaluation of Consumer Sleep-Tracking Wearables and Nearables in Healthy Young and Older Adults*, 7 SLEEP ADVANCES (2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC12936866/pdf/zpag006.pdf.
[36] *Supra* Note 33..
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*

50. Rather than accurately measuring sleep stages, the Rings merely attempt to infer sleep stages through algorithmic prediction. Defendants apply proprietary artificial intelligence and machine-learning models to physiological signals collected from the finger and then estimate what sleep stage may have occurred.[42] These estimates are not direct measurements of brain activity, eye movement, or other neurological characteristics used to clinically determine sleep stages.

51. In studies sponsored by Oura, Defendants have acknowledged that the Rings do not measure electrical brain activity or eye movements and are not the same as polysomnography.[43] Despite these admissions in their own promoted studies which are unlikely to be seen or comprehended by most consumers, Defendants nonetheless market the Products as able to accurately track and report sleep stages.

52. Because the physiological signals measured by the Products are merely indirect proxies for sleep, they do not uniquely correspond to any particular sleep stage. Numerous different sleep states can present similar heart-rate, movement, temperature, and blood-oxygen patterns. Consequently, the Rings lack the capability to reliably determine the users' sleep stage. Any sleep-stage output generated by the Products therefore reflects a prediction rather than an actual measurement of the neurological activity that clinically defines sleep stages.

53. Accordingly, Defendants' representations that the Products accurately track sleep stages are false, misleading, and conceal material facts such that they are likely to deceive reasonable consumers.

**D. Oura's Competitors Either Avoid Similar Representations or Employ Technology That Directly Measures Neurological Activity**

54. Oura's competitors that employ similar predictive technologies to measure sleep stage proxies, such as Apple, Samsung, and Fitbit, do not make similar representations to consumers regarding their respective wearable sleep tracker's ability to measure sleep stages.

---

[42] *Id.*

[43] Thomas Svensson et. al., *Validity and Reliability of the Oura Ring Generation 3 (Gen3) with Oura Sleep Staging Algorithm 2.0 (OSSA 2.0) When Compared to Multi-Night Ambulatory Polysomnography: A Validation Study of 96 Participants and 421,045 Epochs*, 115 SLEEP MED 251 (2024), https://www.sciencedirect.com/science/article/pii/S1389945724000200?via%3Dihub.

55. The JMIR Study found that other wearable sleep trackers, such as the Google Pixel Watch, the Galaxy Watch 5, the Fitbit Sense 2, and the Apple Watch 8, were more accurate at tracking sleep stages than the Oura Ring 3. These products had accuracies of 63.55%, 64.94%, 64.64% and 56.40% relative to PSG respectively, compared to the Oura Ring 3's 56.27%.[44]

56. Despite the fact that other wearable sleep trackers have been found to be more accurate in peer-reviewed studies, other companies have not made similar assurances regarding accuracy of sleep stage tracking to consumers as Oura has. For instance, Apple made clear to consumers in a press release announcing its watchOS 9 ("Apple Watch"), which similarly deploys a predictive model, can only "***estimate*** when users are in REM, Core, or Deep sleep, and when they are awake."[45] (Emphasis added). Apple also clarified to consumers that the Apple Watch uses a machine learning model, which was "trained and validated against the clinical gold standard, polysomnography, with one of the largest and most diverse populations ever studied for a wearable."

57. Similarly, Google has clearly stated to consumers that in contrast to "clinical labs, [where] experts use sensors on the brain and muscles to track sleep[,]" the Fitbit, which similarly deploys a predictive model, "uses a more comfortable and convenient way to ***estimate*** sleep stages by monitoring your body's signals directly from your wrist."[46] (Emphasis added).

58. Samsung also stated that its Smartwatch, which similarly deploys a predictive model, is able to "track the quality of your sleep taking into account factors like hear rate variability, skin temperature, SPO2 and more. These ***all build a picture to provide a holistic view*** of your sleeping habits and how best to improve them."[47]

59. Oura's representations are more like those made by companies for products that are in fact able to track sleep stages by deploying the PSG method, such Sleep Profiler EEG Sleep Monitor, which is described to deploy methods that are "Auto-Staging Validated to PSG."[48]

---

[44] *Supra* Note 32.
[45] https://www.apple.com/newsroom/2022/09/watchOS-9-is-available-today/
[46] https://support.google.com/googlehealth/answer/14236712?
[47] https://www.samsung.com/ae/mobile-phone-buying-guide/how-do-smartwatches-track-your-sleep/
[48] https://www.advancedbrainmonitoring.com/products/sleep-profiler

60. Accordingly, in the context of the wearable sleep tracker industry, consumers are led to believe by Oura that its Rings can track sleep stages, because comparable products that use similar predictive models to estimate sleep stages are clearly described as such.

**E. Plaintiff's Experience with Oura Rings**

61. In or around May 2026, Plaintiff was asked by a family member who suffers from insufficient sleep and related health problems for an Oura Ring as her birthday present because she wanted to be able to accurately track her sleep cycles to collect data that she could use to inform future sleep-related habits.

62. Plaintiff, known in his family for his sophisticated knowledge regarding health-related technology, devoted substantial time to researching Oura and the Rings online, and saw all or substantially all of the representations made by the Company as alleged herein.

63. Like the majority of consumers, Plaintiff does not possess training, education, or specialized knowledge concerning sleep-science technology, neurological monitoring, or the sensors required to directly identify sleep stages. As a result, Plaintiff lacks the ability to independently determine whether the Products have the technical capability to perform as represented and cannot verify the truth of Defendants' claims on her own.

64. Plaintiff did not observe any prominent warning, disclosure, qualification, or explanation in Defendants' advertising, packaging, labels, or promotional materials indicating that the Product could not directly and accurately determine sleep stages. Nothing he observed dispelled the impression created by the Oura's representations.

65. In reliance on Defendants' representations that the Rings were able to accurately and directly track sleep cycles, Plaintiff decided that the Product was a suitable gift for his family member's needs, and purchased her the Oura Ring 5 on Amazon for $499 on June 16, 2026.

66. At the time he purchased the Product, Plaintiff was unaware that the Product allegedly lacked the technology necessary to directly measure physiological signals associated with sleep stages. Plaintiff therefore had no reason to believe that Defendants' representations were inaccurate.

67. Plaintiff gave the Rings to his family member for her birthday, who proceeded to use them exactly as instructed.

68. Had Plaintiff known the Product allegedly could not provide accurate sleep-stage measurement, he would not have purchased it or would have paid substantially less for it.

69. Plaintiff continues to encounter the Products in the marketplace and would consider purchasing them in the future if the sleep-tracking claims promoted by Defendants were in fact accurate.

**CLASS ACTION ALLEGATIONS**

70. Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action may be properly maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

71. Plaintiff seeks to represent a nationwide class comprised of all persons in the United States who purchased the Products ("the Class").

72. Plaintiff also seeks to represent a subclass of New York residents who purchased the Products ("the New York Subclass" or "the Subclass").

73. Upon completion of discovery with respect to scope of the Class and Subclass, Plaintiff reserves the right to amend the Class and Subclass definition. Excluded from the Class and Subclass are Defendants, their parents, subsidiaries affiliates, directors and officers, and members of their immediate families.

74. While the exact number of members cannot be determined, the Class and Subclass consist of, at a minimum, thousands of persons across the United States who purchased the Products. The members of the Class and Subclass are therefore so numerous that joinder of all members is impracticable. The precise number of Class and Subclass members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

75. There are common questions of law and fact exist as to all members of the Class and/or Subclass, including, but not limited to:

a. whether Defendants made false or materially misleading representations regarding the capacity of the Oura Rings, or omitted and concealed material facts;

b. whether Defendants' conduct constituted a violation of the California CLRA, Cal. Civ. Code §§ 1750, et esq.;

c. whether Defendants' conduct constituted an unfair, unlawful, and/or fraudulent business practice in violation of the California UCL, Cal. Bus. & Prof. Code § 17200, et seq.;

d. whether Defendants' conduct constituted a violation of New York General Business Law § 349;

e. whether Defendants' conduct constituted unjust enrichment;

f. whether Defendants' conduct damaged members of the Class and, if so, the measure of those damages; and

g. whether all members of the Class are entitled to seek actual and punitive damages, or other equitable relief, from Defendants.

76. Plaintiff's respective claims are typical of the claims of the Class and Subclass because Plaintiff and all Class and Subclass members have sustained damages arising out of Oura's common course of conduct as outlined herein. The damages of each member of the Class and Subclass were caused and are continuing to be caused by Oura's business practices.

77. Plaintiff will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff is committed to pursuing this action and has retained competent counsel experienced in litigation of this type, and class action litigation in particular. Plaintiff has no interests antagonistic to those of other Class and Subclass members.

78. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members.

79. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case a class action.

**CAUSES OF ACTION**

**COUNT I**

**Violation of the California Consumers Legal Remedies Act**

**Cal. Civ. Code §§ 1750, et esq.**

*On Behalf of the Class*

80. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

81. The conduct of Defendants alleged above constitutes an unfair or deceptive act or practice in violation of the CLRA, Cal. Civ. Code §1750, et seq.

82. Cal. Civ. Code §1761(c) defines a "person" as "an individual, partnership, corporation, limited liability company, association, or other group, however organized." Defendants are persons as defined by Cal. Civ. Code §1761(c).

83. Cal. Civ. Code § 1761(d) defines a "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Plaintiff and Class members are consumers as defined by Cal. Civ. Code § 1761(d).

84. Cal. Civ. Code § 1761(e) defines a "transaction" as "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." Plaintiff's purchase of an Oura Ring was a transaction under Cal. Civ. Code § 1761(e).

85. The California CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any

consumer," which, among other instances enumerated in the CLRA, include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); or "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)).

86. Defendants' conduct, as alleged herein, violates California Civil Code § 1770(a)(5) because Defendants represented that the Products possessed characteristics, uses, benefits, and qualities that they do not have. Specifically, Defendants represented that the Products could accurately track users' sleep stages and provide clinically meaningful sleep-stage data, when in fact the Products lack the sensors necessary to directly measure the neurological activity required to determine sleep stages.

87. As described above, Defendants uniformly marketed the Products through their websites, social media accounts, influencer campaigns, retail partners, and other promotional materials as capable of accurately identifying REM sleep, deep sleep, light sleep, and wakefulness. These representations are misleading because they create the impression that the Products directly measure and accurately determine sleep stages. In reality, the Products do not measure brain activity, eye movements, or other neurological signals that clinically define sleep stages, and instead generate algorithmic estimates based upon indirect physiological proxies.

88. Defendants' conduct also violates California Civil Code § 1770(a)(7) because Defendants represented that the Products were of a particular standard, quality, and grade when they were of another. Defendants represented that the Products provided highly accurate and scientifically validated sleep-stage tracking comparable to clinical methods of sleep measurement. However, as alleged herein, the Products cannot perform the sleep-stage tracking functions represented by Defendants and therefore do not conform to the quality and standards communicated to consumers.

89. Defendants' conduct further violates California Civil Code § 1770(a)(9) because Defendants advertised the Products with the intent not to sell them as advertised. Defendants advertised the Products as capable of accurately tracking sleep stages despite knowing that the Products lacked the neurological sensors required to directly determine sleep stages and despite

knowing that the Products merely infer sleep stages through proprietary algorithms. Notwithstanding that knowledge, Defendants continued to market the Products as providing accurate stage-by-stage sleep tracking and clinically meaningful sleep analysis.

90. The representations and omissions described herein concern material facts that a reasonable consumer would consider important when deciding whether to purchase a premium-priced sleep-tracking device. Plaintiff and Class Members reasonably and justifiably relied upon Defendants' representations regarding the Products' sleep-tracking capabilities, accuracy, and scientific validity when deciding to purchase the Products.

91. Plaintiff and Class Members would not have purchased the Products, or would have paid substantially less for them, had they known that the Products could not directly measure sleep stages and could not provide the level of sleep-tracking accuracy represented by Defendants. As a result, Plaintiff and Class Members suffered economic injury and did not receive the benefit of the bargain.

92. Plaintiff and the other members of the Class have been injured and continue to be injured as a direct and proximate result of Defendants' violations of the CLRA and are entitled to recover damages, restitution, injunctive relief, declaratory relief, attorneys' fees, costs, and all other relief available under California Civil Code § 1780.

93. Pursuant to California Civil Code § 1782, Plaintiff will provide Defendants with written notice of their CLRA violations and demanded that Defendants correct, repair, replace, or otherwise rectify the unlawful practices alleged herein. Plaintiff will further demand that Defendants provide appropriate relief to affected consumers, including monetary restitution and other remedies authorized by law.

94. If Defendants fail to adequately remedy the violations described herein within the time provided by the CLRA, Plaintiff, individually and on behalf of the Class, will seek actual damages, restitution, injunctive relief, punitive damages where permitted by law, attorneys' fees, costs, and all other relief authorized by California Civil Code §§ 1770 and 1780.

**COUNT II**

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

*On Behalf of the Class*

95. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

96. Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful," "unfair" and "fraudulent" business acts or practices within the meaning of the UCL.

97. Defendants' conduct is ***fraudulent*** within the meaning of the UCL because it is likely to deceive reasonable consumers. Defendants represented that the Rings could accurately track users' sleep stages, including REM sleep, deep sleep, light sleep, and wakefulness, and repeatedly promoted the Products as delivering clinically accurate sleep-stage data and insights. In reality, the Rings lack the sensors necessary to directly measure the neurological activity required to determine sleep stages and therefore cannot perform as represented.

98. Defendants further deceived consumers by concealing and omitting material facts regarding the Products' limitations, including that the Products do not measure brain activity, eye movements, or other physiological signals that clinically define sleep stages, and instead generate sleep-stage outputs through algorithmic estimations derived from indirect physiological proxies.

99. Defendants' conduct is ***unlawful*** and therefore constitutes unfair competition within the meaning of the UCL because it violates, among other laws, California Civil Code §§ 1572, 1573, 1709, and 1710; the Consumers Legal Remedies Act, California Civil Code § 1770 et seq.; and the False Advertising Law, California Business and Professions Code § 17500 et seq..

100. Defendants' conduct is also ***unfair*** because the harm caused to consumers outweighs any utility associated with Defendants' practices. Defendants marketed and sold the Rings at a premium based on representations concerning accurate sleep-stage tracking while knowing that the Rings could not deliver the advertised functionality. Consumers paid substantial prices for Products they reasonably believed would provide accurate sleep-stage measurement and analysis, but instead received Rings incapable of directly determining sleep stages to their detriment.

101. Defendants' conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Defendants knowingly exploited consumers' desire to understand and improve their sleep health by promoting the Rings as scientifically validated sleep-tracking devices while concealing material limitations regarding the Rings' capabilities.

102. Reasonable consumers could not have reasonably avoided the injury caused by Defendants' conduct because Defendants possessed exclusive knowledge regarding the Products' design, functionality, limitations, testing, and performance characteristics. Consumers were entitled to rely upon Defendants' representations concerning the Products' sleep-tracking capabilities.

103. As a direct and proximate result of Defendants' violations of the UCL, Plaintiff and Class members suffered injury in fact and lost money or property. Plaintiff and Class members purchased the Products, paid a price premium for the Products, and did not receive the benefit of their bargain.

104. Defendants have been unjustly enriched through their unlawful, unfair, and fraudulent conduct and have retained revenues and profits that they otherwise would not have received but for their deceptive practices.

105. Pursuant to California Business and Professions Code §§ 17203 and 17204, Plaintiff and the Class seek restitution of all monies wrongfully acquired by Defendants as a result of the conduct alleged herein.

106. Plaintiff and the Class further seek injunctive relief prohibiting Defendants from continuing the unlawful, unfair, and fraudulent practices described herein and requiring Defendants to make corrective disclosures concerning the Products' true sleep-tracking capabilities.

107. Plaintiff lacks an adequate remedy at law with respect to certain forms of relief sought herein. Accordingly, Plaintiff seeks equitable remedies, including restitution, disgorgement, injunctive relief, and all other available equitable relief, in addition to and/or in the alternative to legal remedies.

108. A constructive trust should be imposed upon all revenues, profits, proceeds, and other benefits wrongfully obtained by Defendants as a result of the conduct alleged herein, for the benefit of Plaintiff and the Class.

## COUNT III

**Violation of New York General Business Law § 349**

*On Behalf of the New York Subclass*

109. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

110. Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendants.

111. New York General Business Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

112. Defendants' representations concerning the Products were directed to consumers and were consumer-oriented. Defendants marketed, advertised, promoted, and sold the Products to the general public, including consumers in New York, through their websites, social media platforms, retail partners, influencers, and other marketing channels. The challenged representations were disseminated broadly and uniformly to consumers.

113. As alleged herein, Defendants engaged in deceptive acts and practices within the meaning of New York General Business Law § 349 by representing that the Products could accurately track users' sleep stages, including REM sleep, deep sleep, light sleep, and wakefulness, and by promoting the Products as providing clinically accurate and scientifically validated sleep-stage data and insights when, in reality, the Products lack the ability to directly measure the neurological activity required to determine sleep stages.

114. Defendants further engaged in deceptive acts and practices by concealing and omitting material facts concerning the Rings' limitations, including that they do not measure brain activity, eye movements, or other physiological signals that clinically define sleep stages and instead generate sleep-stage outputs through algorithmic estimates derived from indirect physiological signals.

115. Defendants' conduct with respect to the advertising, promotion, marketing, and sale of the Rings constitutes deceptive business practices, false promises, material omissions, and

misrepresentations, including representing and suggesting to consumers that the Products are capable of accurately tracking and measuring sleep stages and providing clinically meaningful sleep-stage data when they are not capable of doing so.

116. Plaintiff and members of the New York Subclass reasonably relied on Defendants' deceptive representations and omissions when purchasing the Rings.

117. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and members of the New York Subclass suffered injury and damages because they purchased Products that did not possess the characteristics, qualities, and capabilities represented by Defendants and paid more for the Products than they otherwise would have paid absent Defendants' deceptive conduct.

118. Plaintiff and the New York Subclass are entitled to recover their actual damages, statutory damages, injunctive relief, attorneys' fees, costs, and all other relief available pursuant to New York General Business Law § 349.

**COUNT IV**

**Unjust Enrichment**

*On Behalf of the Class*

121. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

122. Through the conduct alleged herein, Oura received and retained tangible benefits at the expense of Plaintiff and Class members, including by collecting substantially higher payment for the Rings that they would not have been able to collect had they not concealed the Rings could not accurately track sleep stages.

123. Under the principles of public policy and equity, Defendants should not be permitted to retain the revenue it acquired through its unlawful conduct, i.e., its sale of the Products at an artificially inflated price based on false and materially misleading representations and concealment of the true nature of that Rings to consumers who would not have otherwise purchased it, or at least not on the same terms. All money, assets, and benefits that Defendants have unjustly received because of their actions rightfully belong to the Class.

124. To remedy Defendants' unjust enrichment at the expense of Plaintiff and the Class, the Court should order Defendant to immediately return Plaintiff's and Class Members' payments made as a result of Defendant's illicit conduct, and disgorge any amounts received by Defendant resulting therefrom.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

a. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Appoint Plaintiff as representative of the Class, and designate the undersigned as Class Counsel;

c. Declare Defendant's conduct unlawful;

d. Award Plaintiff and the Class damages under common law and by statute, including punitive damages;

e. Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

f. Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

g. Grant such other equitable relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all triable issues.

Dated: September 22, 2026

Respectfully submitted,

*/s/ Philip M. Black*
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
100 Pine St. Ste. 1250
San Francisco, CA 94111
Telephone: 415-745-3232
Email: pblack@wolfpopper.com

Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
570 Lexington Ave.
New York, NY 10022

Telephone: (212) 759-4600
Email: scoffin@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*